**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Tyler B. Wilson,

            Plaintiff,

vs.

Taronis Fuels Incorporated,

            Defendant.

No.  CV-22-00229-PHX-SPL

**ORDER**

Before the Court is Plaintiff Tyler B. Wilson's ("Plaintiff") Opening Brief (Doc. 29) in support of his claim for benefits under § 503(a)(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The administrative record has been filed (Docs. 22–25), Defendant Taronis Fuels Incorporated ("Defendant" or "Taronis") filed a Response brief (Doc. 37), and Plaintiff filed a Reply brief (Doc. 41). Having fully reviewed the record and the parties' briefing, the Court finds in Defendant's favor, for the reasons explained below.[1]

## I.   __BACKGROUND__

This case concerns Plaintiff's request for relief under § 502(a)(1) of ERISA to recover the benefits he alleges were wrongfully denied to him by Defendant. Specifically, Plaintiff alleges that, following his resignation for "Good Reason," Defendant failed to pay

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending briefing suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

the requisite amounts as provided under the terms of the Executive Severance Plan (the "Severance Plan"). (Doc. 1 at 1). Plaintiff seeks the full amount owed under the Severance Plan. (*Id.* at 18). Defendant, conversely, argues that Plaintiff "resigned, solely on his own volition, without Good Reason pursuant to the [] Severance Plan," and that Defendant therefore was justified in denying Plaintiff's claim for severance benefits. (Doc. 37 at 1).

Plaintiff's employment with Defendant began in August 2019, when he joined the company as its Chief Financial Officer ("CFO"), Secretary, and General Counsel. (Doc. 1 at 4). In November 2019, the parties signed the "Employment Agreement," which "constituted his 'Participation Agreement' within the meaning of [Defendant]'s Severance Plan." (*Id.*). Under the Severance Plan, Plaintiff was entitled to certain benefits upon the occurrence of a "Qualifying Termination." (*Id.*). Section 4.4(a) of the Severance Plan provides that a Qualifying Termination occurs where the participant terminates for Good Reason *or* where Defendant terminates "for any reason other than for Cause." (Doc. 23-1 at 82). Section 4.4(b) of the Severance Plan provides several conditions or events, the existence or occurrence of which—without the participant's prior written consent— constitute Good Reason. (*Id.* at 83). Relevant here are two such "conditions or events":

> (iii) a sustained and material reduction in the Participant's job title or responsibilities; and
>
> (iv) a material breach by the Company of any term of the Participant's employment agreement with the Company or of the Participant's other agreements with the Company.

(*Id.*). For benefits to be payable, § 4.4(b) requires that: (1) "the Participant gives the Company written notice, within ninety (90) days following the first occurrence of the condition(s) that the Participant believes constitute(s) 'Good Reason'"; (2) "the Company fails to remedy such condition(s) within thirty (30) days following receipt of the written notice (such 30-day period, the 'Company Cure Period')"; and (3) "the Participant voluntarily terminates the Participant's employment with the Company within thirty (30) days following the end of the Company Cure Period." (*Id.*).

Sections 4.1–4.3 provide the benefits that are available—and their respective

amounts—in the event of a Qualifying Termination, including the participant's base salary for three years[2], bonus awards for the year in which the Qualifying Termination occurred, unpaid bonus awards for the year prior, and a lump sum equal to three years of the monthly premiums for medical and dental coverage. (*Id.* at 81–82). With respect to the bonus award, the participant is entitled to either a prorated amount for the year in which the Qualifying Termination occurred *or*, in the event of a "Change in Control," the maximum bonus under the participant's Employment Agreement. (*Id.* at 81). The Severance Plan defines Change in Control to include "a change in the effective control of the Company that occurs on the date that a majority of members of the Board is replaced during any twelve (12) month period by members of the Board whose appointment or election is not endorsed by a majority of the members of the Board prior to the date of the appointment or election." (*Id.* at 78–79). "For benefits to be affected by a Change in Control, a Qualifying Termination must occur during a 'Change-in-Control Period,' meaning a period of 15 months beginning three months before the effective date of a Change in Control." (Doc. 1 at 5; *see also* Doc. 23-1 at 79 (defining Change-in-Control Period)).

Section 9 of the Severance Plan provides the "Claims and Appeals" procedures in accordance with 29 C.F.R. § 2560.503-1. (Doc. 23-1 at 88). Any participant who "is not receiving, or believes that he . . . is not receiving, the full amount of benefits under the [Severance Plan] to which he . . . is entitled" may file a claim for benefits in writing that shall be delivered to the "Claim Reviewer." (*Id.*). The Claim Reviewer is "a person or entity designated in writing by the Administrator [*i.e.*, the Compensation Committee of the Board] as the Claim Reviewer for this Plan, or if no such person or entity has been designated, the Company's General Counsel." (*Id.* at 79). The Claim Reviewer has 90 days to issue a decision on the claim for benefits. (*Id.* at 88). "If a claim for benefits is denied in whole or in part, the claimant may appeal the denial to the Claim Reviewer . . . within 60

_____

[2] Defendant's Severance Plan provides for only two years' base salary. (*See* Doc. 23-1 at 80). However, Plaintiff's Employment Agreement modified this to increase the base salary portion of the severance benefit to *three* years' base salary. (Doc. 22-2 at 33).

days after the claimant receives written notice that his or her or its claim has been denied."
(*Id.*). The Claim Reviewer then has 60 days to issue a decision on the appeal. (*Id.* at 89).
The claimant has a right to be provided with "reasonable access to, and copies of, all
documents, records, and other information relevant to his or her or its claim for benefits."
(*Id.*). If the claim is again denied, the claims review procedures are deemed to have been
exhausted, and the claimant has a right to bring a civil action in court under § 502(a) of
ERISA. (*Id.* at 88–89).

In December 2020, the parties amended the Employment Agreement to, among
other things, end Plaintiff's tenure as Defendant's CFO. (Doc. 1 at 6). On January 21, 2021,
Plaintiff was awarded a bonus for 2020 pursuant to the "Unanimous Written Consent of
the Compensation Committee of the Board of Directors in Lieu of a Special Meeting" (the
"Written Consent"). (*Id.* at 8). The Written Consent "divided [the] 2020 bonus between
cash and shares of Taronis stock, with the $137,500 cash portion to be paid in equal weekly
installments over a 52-week period." (*Id.*). Defendant "made two of the weekly bonus
payments, on January 29, 2021 and February 5, 2021, and then stopped making them
altogether." (*Id.*). In their briefing before this Court, the parties dispute whether the
payment method—via weekly payments, as opposed to a lump sum—*and* Defendant's
decision to cease the payments altogether constituted breaches of Plaintiff's Employment
Agreement. (*See* Docs. 29 at 19–20; 37 at 14; & 41 at 9–10).

On February 12, 2021, Thomas Wetherald (shareholder) and Tobias Welo (Board
member appointed in December 2020) filed a Schedule 14A Preliminary Consent
Statement "seeking shareholder consent to remove all five members of Taronis' Board and
elect in their place" five individuals: Wetherald, Welo, Mary Pat Thompson (who had
replaced Plaintiff as CFO on December 1, 2020, before resigning from the position just 20
days later), Andrew McCormick, and Sergey Vasnetsov (collectively, the "Nominees").
(Doc. 1 at 6). Plaintiff alleges that the Nominees took issue with the company's financial
model by "criticiz[ing] Plaintiff] and others' compensation and benefits arrangements" and
"pledging to find cause to terminate [Plaintiff] and others to avoid severance payments to

them." (*Id.* at 2). Plaintiff also alleges that "Taronis and the incumbent Board members strenuously opposed the Nominees' campaign" to replace the Board. (*Id.* at 7). Ultimately, on April 8, 2021, Taronis and the Nominees "finalized an agreement to resolve their disputes on terms that included the resignation of all Board members apart from Peter Malloy and the appointment of the Nominees to the Board." (*Id.* at 7).

Beginning in February 2021—around the time the Nominees began seeking to replace the Board—Plaintiff alleges that Defendant "materially reduced [his] responsibilities as General Counsel, circumventing him in the management and even retention of outside counsel and excluding him entirely from negotiations to settle the proxy battle over control of the Board and related Delaware Chancery Court litigation between Taronis and the Nominees." (*Id.* at 9). Defendant argues that its use of outside counsel during this time was for "discrete matters" only and did not amount to a sustained and material reduction of Plaintiff's job responsibilities. (Doc. 37 at 4). Defendant adds that the matters for which outside counsel was engaged "related in part to allegations against [Plaintiff]" and that it therefore "would have been inappropriate and a conflict of interest for him to" be involved. (*Id.*). This dispute—whether Plaintiff experienced a sustained and material reduction in his job duties—is one of the central issues before the Court and is discussed at length below.

On April 5, 2021—days before the above-mentioned agreement between Taronis and the Nominees that appointed the Nominees to the Board—Plaintiff delivered a Notice of Good Reason Pursuant to Section 4.4 of the Executive Severance Plan, alleging a sustained and material reduction in his job responsibilities and a material breach by Defendant of his Employment Agreement.. (Doc. 1 at 9; *see also* Doc. 22-8 at 13–16). On May 4, 2021, at the end of the 30-day Company Cure Period, "Mr. Welo, who had since become Board Chair, wrote to [Plaintiff] stating Taronis' position that [Plaintiff] did not set forth 'Good Reason' pursuant to the Severance Plan." (Doc. 1 at 9; *see also* Doc. 22-10 at 5–8). Two days later, Plaintiff submitted his resignation from the company, "noting that the conditions described in his [Notice of Good Reason] had not been remedied during

the 30-day cure period and invoking his right to benefits under the Severance Plan." (Doc. 1 at 9; *see also* Doc. 22-10 at 10–11).

On May 19, 2021, Plaintiff contends that his counsel initiated the claims procedure by sending a letter to Defendant's counsel "explaining the amounts owed to [Plaintiff] following his Qualified Termination within a Change-in-Control period." (Doc. 1 at 9; Doc. 22-2 at 1–4). Defendant apparently did not treat the letter as an initiation of the claims procedure because the letter "did not reference or invoke the claims procedure under § 9.2 of the [Severance] Plan." (Doc. 37 at 6). Rather, on May 25, 2021, Defendant's counsel simply responded to the letter via email indicating that the letter did not change the company's position:

> As you know, we are counsel to Taronis Fuels. We are in receipt of your letter dated May 19, 2021. Nothing therein alters the Company's position, as set forth in Mr. Welo's May 4, 2021 letter, that your client did not have Good Reason to resign from his employment. Thus, [Plaintiff] is not owed any benefits under the Executive Severance Plan.
>
> Also, you are incorrect that there was a Change in Control. The incumbent directors approved the new directors' appointment by written consent dated April 8, 2021. Accordingly, there was no Change in Control under the Executive Severance Plan.

(Doc. 1 at 9–10; *see also* Doc. 22-2 at 5). On May 28, 2021, Plaintiff—treating Defendant's May 25, 2021 email as a denial of his claim—"made a request for information relevant to the denial of his Claim pursuant to Section 9.3 of the Severance Plan and stated his intention to appeal the denial." (Doc. 1 at 10; *see also* Doc. 22-2 at 7–10). On June 10, 2021, Defendant's counsel "request[ed] clarification from counsel for [Plaintiff] regarding the May 19 correspondence and whether [Plaintiff] intended that letter to be an initial claim under § 9.2 of the [Severance] Plan." (Doc. 37 at 6; *see also* Doc. 22-2 at 11). On June 16, 2021, Plaintiff's counsel sent a letter asserting Plaintiff's position that the May 19, 2021 letter *did* amount to a claim and that Defendant's May 25, 2021 email constituted a denial of that claim. (Doc. 22-2 at 14).

On June 22, 2021, Defendant's counsel responded with an email setting forth

Defendant's position that the May 19, 2021 letter did not initiate the claims procedure and that Defendant's May 25, 2021 email could not be construed as a denial of a claim. (Doc. 22-2 at 16). Despite the parties' inability to agree on whether the May 19, 2021 letter initiated the claims procedure, Defendant agreed to recognize Plaintiff's claim and stated that a Claim Reviewer would be appointed and would issue a decision within 90 days, pursuant to the Severance Agreement. (*Id.*). On July 14, 2021, Board member McCormick sent a letter to Plaintiff indicating that he had been appointed by Taronis as the Claim Reviewer to consider Plaintiff's claim.[3] (Doc. 1 at 10; *see also* Doc. 22-10 at 41). On July 23, 2021, Plaintiff submitted a timely appeal to preserve his position that the claim had already been denied on May 25, 2021. (Docs. 1 at 11 & 29 at 13; *see also* Doc. 22-2 at 22–28). Defendant "responded that the appeal was premature until Mr. McCormick made his determination on the Claim and took no action on the appeal." (Doc. 1 at 11).

On August 16, 2021, McCormick issued a denial of Plaintiff's claim, "asserting that the changes in [Plaintiff]'s job duties and responsibilities were not a sustained and material reduction, and the failure to pay [Plaintiff]'s bonus was not a breach of the Employment Agreement." (Doc. 29 at 13; *see also* Doc. 22-10 at 51–60). On October 13, 2021, Plaintiff "submitted a supplement to his July 23, 2021 appeal, this time directed to Mr. McCormick," further explaining the circumstances constituting the Good Reason for his resignation and "reserving his right to dispute the propriety of Mr. McCormick's appointment as Claim Reviewer and his position that the May 25, 2021 Claim denial was not properly retracted." (Docs. 1 at 12–13 & 29 at 13; *see also* Doc. 24-2 at 23–30). On

---

[3] The Severance Plan defines the Claim Reviewer as the person or entity designated as the Claim Reviewer or, if there is none, the company's General Counsel. (Doc. 23-1 at 79). However, no Claim reviewer was designated for the Severance Plan as of the date of Plaintiff's claim, and the company was without a General Counsel. (Doc. 1 at 11). According to Defendant, McCormick was appointed as Claim Reviewer "through the [Severance] Plan's delegation power, as well as §§ 2.1(g) and 8.5 of the [Severance] Plan." (Doc. 37 at 7). Plaintiff, conversely, asserts that "[n]o documents, records, or other information about . . . McCormick's appointment as Claim Reviewer has been produced to [Plaintiff], despite his request and clear right to the information under the Severance Plan and ERISA." (Doc. 1 at 11).

December 12, 2021, McCormick denied Plaintiff's appeal. (Doc. 1 at 13; *see also* Doc. 25-7 at 9–15).

On February 11, 2022, Plaintiff—having exhausted the claims and appeal procedures under the Severance Plan—filed the instant action pursuant to § 502(a)(1) of ERISA. (Doc. 1 at 1, 17). Plaintiff seeks to recover the following benefits pursuant to the Severance Agreement and his Employment Agreement:

(i) Base salary of $275,000 per year for three years, or $825,000;

(ii) Unpaid bonus compensation for 2020 in the amount of $132,211.54;

(iii) Bonus compensation for 2021 in the amount of $825,000; and

(iv) A lump sum payment for COBRA [medical and dental] benefits in the amount of $91,002.24.

(*Id.* at 16–17). In sum, Plaintiff seeks a total of $1,873,213.78 in benefits. Plaintiff asserts that his Qualifying Termination occurred during a Change-in-Control period, entitling him to his maximum 2021 bonus award as opposed to a prorated amount. (*Id.* at 17–18).

On July 22, 2022, the Administrative Record was filed. (Docs. 22–25). On August 10, 2022, Plaintiff filed his Opening Brief. (Doc. 29). On September 12, 2022, Defendant filed its Response Brief. (Doc. 37). Finally, on September 26, 2022, Plaintiff filed his Reply Brief. (Doc. 41). On November 22, 2022—following Defendant's filing for bankruptcy—the Court issued an Order staying this action. (*See* Docs. 49–50). On March 3, 2023, the stay was lifted. (*See* Docs. 51–52).

## II.  **LEGAL STANDARD**

"ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal quotations and citations omitted). "The Act furthers these aims in part by regulating the manner in which plans process benefits claims." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003). Where a claimant is denied benefits by a plan administrator—both initially and after being given an opportunity to appeal—the claimant "may then seek relief in federal court 'to recover

benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1185 (9th Cir. 2022) (alterations omitted) (quoting ERISA § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B)). "Depending upon the language of an ERISA plan, a district court reviews a plan administrator's decision to deny benefits either *de novo* or for abuse of discretion." *Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1112 (9th Cir. 2001). Generally, the Court reviews a plan administrator's denial of benefits *de novo*. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (citing *Firestone*, 489 U.S. at 115) ("*De novo* is the default standard of review."). However, where the benefits plan "confer[s] discretion on the administrator 'to determine eligibility for benefits or to construe the terms of the plan,'" the standard of review shifts to abuse of discretion. *Id.* (quoting *Firestone*, 489 U.S. at 115). The parties here dispute the standard of review that applies.

### III.  __DISCUSSION__

Plaintiff contends that Defendant "unlawfully failed and refused to pay the severance benefit to which he is entitled under [the Severance Plan], totaling $1,873,213.78." (Doc. 29 at 4). He argues that the Court should apply a *de novo* standard of review. (*Id.* at 14–16). Plaintiff contends that his resignation was a Qualifying Termination under the Severance Plan, as it resulted from "(1) a sustained and material reduction of his duties and responsibilities as the company's General Counsel throughout February and March 2021, and (2) a material breach of his Employment Agreement and the "Executive Bonus Plan" by failing to pay his 2020 bonus." (*Id.* at 17). Plaintiff asserts that each of these conditions amounted to Good Reason under the Severance Plan. (*Id.*).

Defendant argues that the Court should apply an abuse of discretion standard of review. (Doc. 37 at 8–11). With respect to Plaintiff's claim for benefits, Defendant's position is that Plaintiff resigned on his own volition and without Good Reason. (*Id.* at 1). Defendant explains that Plaintiff did not experience a sustained and material reduction in his job duties, and that Taronis did not materially breach Plaintiff's Employment

Agreement. (*Id.* at 12–14). Defendant additionally argues that, even if Plaintiff is entitled to benefits, his resignation did not occur during a Change in Control Period and that his benefits award should be reduced accordingly. (*Id.* at 14–16).

The Court will first address the appropriate standard of review. It will then turn to whether Plaintiff was correctly or incorrectly denied benefits under the Severance Plan. If necessary, the Court will additionally address whether Plaintiff's resignation occurred during a Change in Control Period.

**A. Standard of Review**

As noted above, the presumptive standard of review of a decision to deny benefits is *de novo*. *Abatie*, 458 F.3d at 963 (citing *Firestone*, 489 U.S. at 115) ("*De novo* is the default standard of review."). However, where the decision-maker exercises discretionary powers, a deferential standard of review is appropriate. *See Firestone*, 489 U.S. at 111 (noting that trust law principles guide standard of review determination and "make a deferential standard of review appropriate when a trustee exercises discretionary powers"). Therefore, if a plan unambiguously "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," a denial of benefits is reviewed for abuse of discretion. *Id.* at 115. The party seeking discretionary review has the burden to establish that the plan grants discretionary authority to the decisionmaker. *Ingram*, 244 F.3d at 1112.

"To assess the applicable standard of review, the starting point is the wording of the plan." *Abatie*, 458 F.3d at 962–63 (citation omitted). "Although there are no 'magic words' that a plan must include to confer discretion, it must nevertheless clearly indicate that the decision-maker has discretion to grant or deny benefits, or to interpret the plan's terms." *Tuttle v. Varian Med. Syst. Inc.*, 15 F. Supp. 3d 944, 951 (D. Ariz. 2013) (citing *Feibusch v. Integrated Device Tech., Inc. Emp. Benefit Plan*, 463 F.3d 880, 884 (9th Cir.2006); *Abatie*, 458 F.3d at 964). Here, § 2.1(a) defines the "Administrator" of the Severance Plan as the Compensation Committee of the Board ("Compensation Committee"). (Doc. 23-1 at 78). Section 8.2 provides the powers granted to the Compensation Committee:

> The Administrator's powers include, but are not limited to, the power to adopt rules consistent with the Plan; the power *to decide all questions relating to the interpretation of the terms and provisions of the Plan*; and the power to resolve all other questions arising under the Plan (including, without limitation, the power to remedy possible ambiguities, inconsistencies, or omissions by a general rule or particular decision). *The Administrator has full discretionary authority to exercise each of the foregoing powers*.

(*Id.* at 87 (emphasis added)). Thus, the language of § 8.2 unambiguously grants the Compensation Committee with "full discretionary authority" to exercise its powers under the Severance Plan, which include the power "to decide all questions relating to the interpretation of the terms and provisions of the Plan." (*Id.*). Therefore, the Severance Plan confers discretion on the Compensation Committee.

Critically, however, the Compensation Committee did not make the decisions on Plaintiff's claim and subsequent appeal for benefits. Rather, the denials of Plaintiff's claim and appeal were made by the Claim Reviewer, in accordance with §§ 9.2(b) and 9.3(b) which provide that all claims for benefits and appeals of denied claims are to be decided by the Claim Reviewer. (Doc. 23-1 at 88–89). The fact that a plan may provide a certain body with discretionary authority is not enough for a finding that discretionary review is appropriate unless that body also made the benefits decision. *See Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) (citation and quotations omitted) ("[A]lthough *Firestone* directs courts to defer to the decisions of plans in which their language grants discretionary authority, that deference applies only when the decision is made by the body vested with discretion. When an unauthorized body that does not have fiduciary discretion to determine benefits eligibility renders such a decision . . . deferential review is not warranted."); *see also Tuttle*, 15 F. Supp. 3d at 952 (citations omitted) ("[A]n abuse of discretion standard only applies when a fiduciary to plan participants is the party exercising discretion to make claims decisions. If an unauthorized body that does not have fiduciary discretion denies benefits, *de novo* review applies."). Thus, the question is whether *the Claim Reviewer* was vested with the

same discretionary authority provided to the Compensation Committee. If so, discretionary review of the Claim Reviewer's claim denial is appropriate; if not, this Court must review the determination *de novo*.

The fact that the Claim Reviewer was vested with *decision-making* authority does not amount to a grant of discretionary authority. *See Ingram*, 244 F.3d at 1112–13 (citation omitted) ("An allocation of decision-making authority . . . is not, without more, a grant of discretionary authority in making those decisions."). Aside from granting the Claim Reviewer the power to decide claims for benefits and appeals of any denials of such claims, the Severance Plan does not expressly provide the Claim Reviewer with any other authority, let alone any discretionary authority. (*See generally* Doc. 23-1 at 78–89). Moreover, Defendant fails to identify any grant of discretionary authority to the Claim Reviewer in its Response brief. (*See generally* Doc. 37 at 8–11). Instead, Defendant only refers to §§ 8.1 and 8.2 which, as discussed above, relate solely to the discretionary authority granted to the Compensation Committee in its role as Administrator and do not make any reference to similar authorities being granted to the Claim Reviewer.

Defendant additionally refers to § 8.5 of the Severance Plan and argues that this provision "expressly grants the Administrator the authority to delegate all of its authority to the Claim Reviewer." (*Id.* at 10). At least on this point, Defendant is absolutely correct. Section 8.5 ("Power to Delegate Authority") provides that:

> The Administrator may, in its sole discretion, delegate *to any person or persons* all or part of its authority and responsibility under the Plan, including, without limitation, the authority to amend the Plan.

(Doc. 23-1 at 87 (emphasis added)). Of course, "any person" *includes* the Claim Reviewer and, thus, Defendant is correct that § 8.5 provides the Compensation Committee the power to delegate "all of its authority to the Claim Reviewer." (Doc. 37 at 10). Defendant further contends that "[s]uch authority *was delegated*." (*Id.* (emphasis added)). On this point, Defendant's position is conclusory and entirely unsupported. Defendant does not identify any portion of the Severance Plan that actually delegated discretionary authority to the

Claim Reviewer, nor does Defendant identify any evidence from the record demonstrating that discretionary authority was otherwise conferred on the Claim Reviewer by the Compensation Committee.[4] *See Shane v. Albertson's Inc.*, 504 F.3d 1166, 1171 (9th Cir. 2007) (noting that district court should have focused not only on "whether [the plan] contemplated the possibility of a transfer of discretionary authority to a third-party," but *also* "*whether there was evidence establishing delegation to the* [*third-party*]"); *A.H. by & through G.H. v. Microsoft Corp. Welfare Plan*, No. NO. C17-1889-JCC, 2018 WL 2684387, at *2–3 (W.D. Wash. June 5, 2018) ("Defendants merely point to the Plan language that confers discretion on Microsoft and allows Microsoft to delegate its discretion to third parties. On this record, Defendant has not met its burden to demonstrate the Plan conferred discretion on Premera regarding benefit determinations such that the Court should apply an abuse of discretion standard."). In sum, although it is true that the Compensation Committee had the power to delegate, the Severance Plan does not contain any provision—and Defendant has failed to otherwise identify any evidence from the record—demonstrating that the Compensation Committee exercised this delegation authority to confer discretionary authority on the Claim Reviewer.

---

[4] In the Background section of its Response brief, Defendant states that "Claim Reviewer (Andrew McCormick) was appointed *through the Plan's delegation power*," citing to three places in the record for support. (Doc. 37 at 7 (emphasis added)). First, Defendant cites AR000242, which is the letter from McCormick to Plaintiff informing that McCormick had been appointed as Claim Reviewer and that he intended to provide a written decision within 90 days. (Doc. 22-10 at 41). The letter says nothing about any delegation of discretionary authority.

Second, Defendant cites AR000343, which contains § 2.1(g) of the Severance Plan. (Doc. 23-1 at 79). Section 2.1(g) defines "Claim Reviewer" as the "person or entity designated in writing by the Administrator as the Claim Reviewer for this Plan, or if no such person or entity has been designated, the Company's General Counsel." (*Id.*). Again, this definition says nothing about the Compensation Committee exercising its delegation power to confer discretionary authority on the Claim Reviewer.

Finally, Defendant cites AR000351, which contains §§ 8.2 and 8.5 of the Severance Plan. (*Id.* at 87). As noted above, these sections relate only to the Administrator of the Severance Plan, *i.e.*, the Compensation Committee, and fail to even reference the Claim Reviewer, let alone delegate any discretionary authority to him. (*Id.*).

Defendant has failed to meet its burden to demonstrate that the Severance Plan conferred discretion on the decision-maker—*i.e.*, the Claim Reviewer—such that the Court should apply a discretionary standard. Therefore, the Court will review the Claim Reviewer's denial of benefits *de novo*.

**B.  Whether Plaintiff Resigned with Good Reason**

Where, as here, *de novo* review applies, the Court "'simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits,' in light of all the evidence." *Peterson v. Fed. Express Corp. Long Term Disability Plan*, No. CV-05-1622-PHX-NVW, 2007 WL 1624644, at *19 (D. Ariz. June 4, 2007) (quoting *Abatie*, 458 F.3d at 963). "[T]he court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he [is entitled to benefits] under the terms of the plan." *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010).

*1.  Sustained, Material Reduction in Job Responsibilities*

Plaintiff argues that he experienced a sustained and material reduction in job responsibilities between February and March 2021, when he alleges that he was excluded from core functions of his job such as retaining and managing engagements of outside counsel, negotiating a settlement between the company and the incoming board of directors, and negotiating the exit of Taronis' President and CEO. (Doc. 29 at 4). Plaintiff relies on two specific examples: (1) being excluded from Defendant's decision to retain and its engagement with an outside firm, Coppersmith Brokelman, PLC ("Coppersmith"), and (2) being excluded from all involvement with O'Melveny & Myers LLP ("O'Melveny"), another outside firm, in the negotiation of a settlement agreement. (*Id.* at 18). Plaintiff contends that this sustained and material reduction of his responsibilities provided him with Good Reason under the Severance Plan. (*See* Doc. 23-1 at 83 (providing that Good Reason means, among other conditions or events, "a sustained and material reduction in the Participant's job title or responsibilities")).

With respect to Coppersmith, it is undisputed that the firm was retained for reasons

related to the impending exit of CEO Scott Mahoney from the company and that Coppersmith negotiated Mr. Mahoney's exit. It is also undisputed that Plaintiff was excluded from all engagements with Coppersmith. The Court finds that—under normal circumstances—such exclusion would amount to a sustained and material reduction of Plaintiff's job responsibilities. The reduction was sustained because Plaintiff was not merely excluded from one discrete aspect of Coppersmith's involvement with the Company; rather, Plaintiff was left out of *all* engagements with Coppersmith from the time the firm was retained in February 2021 through the date Mr. Mahoney stepped down as CEO sometime in March 2021.[5] The reduction appears material because Plaintiff was cut out of duties that he would normally be responsible for and transactions that he would normally be intimately involved with as General Counsel, such as retaining Coppersmith in the first place, subsequently working with Coppersmith to plan for and negotiate the exit of a top executive from the company, and otherwise dealing with the legal ramifications involved in such a decision.

Importantly, however, the Claim Reviewer found that Coppersmith "was retained, in part, to advise on [Plaintiff]'s employment status" and concluded that "it would have been inappropriate for the Board to involve [Plaintiff] in privileged communications with outside counsel in connection with advice counsel was giving about [his] employment." (Doc. 25-7 at 10). The Court finds minimal evidence in the record relating to the reason(s) Coppersmith was retained. The record does not contain an engagement letter or any other documentation outlining the relationship that was created between Coppersmith and Taronis. The *only* relevant evidence is a two-page document containing notes from a telephone interview the Claim Reviewer apparently conducted with Taronis' former

---

[5] In their briefing, the parties fail to identify the exact date that Mr. Mahoney stepped down as CEO. Review of the record fails to shed light on this question either. Plaintiff's May 28, 2021 Request for Information provides that Mr. Mahoney stepped down at some point in March 2021. (*See* Doc. 22-2 at 8 (requesting information "related to how Taronis arranged for Scott Mahoney's role and responsibilities to be carried out *after his separation in March 2021*.")).

directors Bill Staunton, Kevin Pollack, and Peter Malloy. (Doc. 23-1 at 99–100). When asked who retained Coppersmith, the Claim Reviewer noted Mr. Pollack's response that the Special Committee "basically turned up evidence of bad behavior by [Plaintiff]" and that the law firm Perkins Coie "recommended Coppersmith because [of its] experience with [Arizona] law." (*Id.* at 99). The notes further indicate Mr. Pollack's explanation that, rather than Plaintiff retaining Coppersmith (in line with his duties as General Counsel), the Special Committee "[t]hought it was inappropriate to involve [Plaintiff] in retaining a firm to look at" the possibility of Plaintiff's own termination. (*Id.*). When asked directly whether Coppersmith was retained to give advice regarding the employment of Mr. Mahoney and Plaintiff, the notes indicate that a director responded "[c]orrect – both, but was mostly of interest to [Mr. Mahoney] [at first], but then more [Plaintiff]." (*Id.*).

Despite the absence of any evidence in the record speaking directly as to why Coppersmith was retained, it is likely that Coppersmith's investigation into Mr. Mahoney's alleged misconduct—which Plaintiff does not dispute—*also* involved questions concerning Plaintiff's involvement. The record is full of evidence tying Plaintiff to the company's suspicions concerning Mr. Mahoney. For example, the December 20, 2020 resignation letters of Mr. Welo and Ms. Thompson and the numerous 2021 SEC filings included in the record note the concerns of fraud and financial irregularities perpetrated by Mr. Mahoney; these documents in turn allude to Plaintiff's own potential knowledge of Mr. Mahoney's conduct. Thus, even assuming Coppersmith was retained only to investigate Mr. Mahoney—which, again, is not disputed by Plaintiff—it is difficult, if not impossible, to imagine such an investigation having nothing to do with Plaintiff given his position within the company, his relationship with Mr. Mahoney, and the many instances in which concerns were raised as it relates to his knowledge of the misconduct. Therefore, the Court agrees with the Claim Reviewer's finding that Coppersmith "was retained, in part, to advise on [Plaintiff]'s employment status." (Doc. 25-7 at 10). To be sure, Plaintiff would *typically* be able to argue that his position as General Counsel necessitated his involvement in the retaining of and engagement with an outside firm, and that exclusion

from such activities would amount to a material reduction of his duties. However, where—as here—the outside firm was brought in to investigate Plaintiff's own potential involvement in misconduct, the Court cannot find that his exclusion amounted to a material reduction of his duties because Plaintiff could not have had any expectation that he would be involved in investigations of and communications about his own employment. The Court finds that Plaintiff did *not* suffer a sustained and material reduction in his job duties as a result of Defendant's dealings with Coppersmith.

Unlike Coppersmith, Plaintiff does not allege that he was excluded from the Company's decision to retain O'Melveny in the first place. Rather, Plaintiff contends that he engaged O'Melveny to assist the Company "in response to the consent solicitation being led by certain investors" and that—until approximately 10 days prior to his April 5, 2021 Notice of Good Reason—he served as the "primary liaison between the Company and O'Melveny. (Doc. 22-8 at 15). Rather, Plaintiff alleges that he was cut out of certain conversations between the Company and O'Melveny beginning on or around March 26, 2021. (*Id.*). Specifically, Plaintiff alleges that certain members of the former Board had a series of "side conversations with [O'Melveny]" as part of the Company's settlement negotiations with the Nominees "without [Plaintiff's] involvement, knowledge, or review of terms." (*Id.*). As a result, Plaintiff contends that he was "intentionally excluded" from the settlement negotiations, and that such exclusion was material because the negotiations posed a "fundamental[] reshap[ing]" of the Company and "present[ed] significant legal issues that would typically be managed from [his] office." (*Id.*).

Although the Court recognizes that Plaintiff's role as General Counsel would reasonably imply that he should have been involved in the settlement negotiations between the Board and the Nominees, the Court cannot find that his alleged ten-day exclusion from the negotiations amounted to a sustained reduction in his job responsibilities. First, Plaintiff was not entirely in the dark with respect to the Company's dealings with O'Melveny. In stark contrast to the Company's dealings with Coppersmith—in which Plaintiff was not even involved in the initial decision to retain the outside firm—Plaintiff acknowledges that

he was involved in the Company's original engagement of O'Melveny and that he served as the "primary liaison" between the Company and O'Melveny for at least some period of time. The fact that the former Board did not involve Plaintiff in specific dealings with the firm over a short, ten-day period does not rise to the level of a *sustained* reduction in his job responsibilities, *even assuming* that it amounted to a reduction of responsibilities that were material to his job position.

Second, the Severance Plan expressly provided Defendant with a 30-day Company Cure Period during which Defendant had the right to remedy any conditions raised in Plaintiff's April 5, 2021 Notice of Good Reason. (*See* Doc. 23-1 at 83). Here, Plaintiff notified Defendant of his position that his exclusion from the settlement negotiations amounted to a sustained and material reduction in his job responsibilities on April 5, 2021. Plaintiff does not dispute that—at some point between April 5 and April 8, 2021 (when the settlement was finalized)—Defendant consulted with Plaintiff and allowed him to review the final terms of the settlement agreement. Plaintiff argues that "including [him] as a rubber stamp at the end of the process is not the same as having him manage the negotiation and documentation of a resolution, which was [his] job." (Doc. 41 at 10). Although this may be true, the "negotiation and documentation" of the settlement agreement was already substantially completed by the time Plaintiff filed his Notice of Good Reason. Defendant could not go back in time and un-ring the bell by involving Plaintiff in such negotiations. Plaintiff's position therefore forecloses any possibility that Defendant could cure the issue. Thus, even assuming that Plaintiff suffered a sustained and material reduction in responsibilities as a result of the Company's dealings with O'Melveny, the Court finds that Defendant did the best it could to cure any harm that resulted from Plaintiff's exclusion by allowing him to review the final settlement agreement.

All told, the Court finds that Plaintiff did not suffer a sustained and material reduction in job responsibilities sufficient to provide him with Good Reason under the

1    Severance Plan.[6]

2    ### 2. *Breach of Employment Agreement*

3    Section 2(b) of the Employment Agreement concerns Plaintiff's "Annual Cash

4    Bonus," stating in part:

> For each calendar year, you will be eligible to receive an annual
> cash bonus (the "Bonus") payable at the end of each calendar
> year of employment or at such other time as agreed to between
> you and the Company. . . . The actual amount of any Bonus,
> and your entitlement to the Bonus, will be subject to the terms
> of the Bonus Plan.

(Doc. 22-2 at 31). The "Executive Bonus Plan" (the "Bonus Plan"), in turn, contains numerous provisions relating to, for example, the administration of, structure of, payment of, and eligibility for bonuses. (*See* Doc. 24-2 at 39–45). On January 21, 2021, Plaintiff was issued a bonus for 2020 (the "2020 Bonus") pursuant to the Written Consent issued by the Compensation Committee. (*See* Doc. 22-8 at 6–11). The Written Consent provided that the 2020 Bonus would total $275,000, but that the Compensation Committee and Plaintiff "determined it [to be] in the best interest of the Company that [the 2020 Bonus] be split 50/50 between cash and equity." (*Id.* at 6). Thus, Plaintiff was to receive $137,500 in cash "paid out in equal weekly installments over a 52-week period" and another $137,500 worth "of the Company's common stock priced as of market close on [January 21, 2021]." (*Id.* at 6). Plaintiff received the first two weekly cash bonus payments on January 29, 2021 and February 5, 2021. (Doc. 1 at 8). Following the second payment, however, Defendant ceased all payments of the 2020 Bonus. (*Id.*).

In his April 5, 2021 Notice of Good Reason, Plaintiff listed several ways in which he asserted that Defendant's payment and termination of the 2020 Bonus breached the

---

[6] Although Plaintiff's Notice of Good Reason listed other ways in which his job responsibilities were sustainably and materially reduced, Plaintiff failed to raise those arguments on his appeal to the Claim Reviewer, (*see* Doc. 25-7 at 9–10 ("Claims Not Appealed")), *or* in his briefing to this Court. Rather, Plaintiff relies only on his allegations related to the Company's dealings with Coppersmith and O'Melveny. The Court has limited its analysis of Plaintiff's benefits claim accordingly.

19

Employment Agreement and therefore provided Plaintiff with Good Reason under the Severance Plan. (Doc. 22-8 at 15–16). Plaintiff reasserted these arguments in his May 19, 2021 Claim Initiation (Doc. 22-2 at 3), his July 23, 2021 Appeal (Doc. 22-2 at 26), and his October 13, 2021 Supplement to Appeal (Doc. 24-2 at 25–29). Defendant objected to Plaintiff's allegations of breach in the May 4, 2021 Response to Notice of Good Reason (Doc. 22-10 at 6–7) and its May 25, 2021 Response to Plaintiff's Claim Initiation (Doc. 22-2 at 5), and the Claim Reviewer rejected Plaintiff's allegations of breach in his August 16, 2021 Denial of Claim (Doc. 22-10 at 56–57) and his December 12, 2021 Denial of Appeal (Doc. 25-7 at 12–13). Now before this Court, Plaintiff argues that Defendant materially breached the Employment Agreement in two ways: (1) the timing and manner of payout for the 2020 Bonus, as provided under the Written Consent, and (2) Defendant's default on the 2020 Bonus payments. (Doc. 29 at 19). The Court must determine whether Defendant materially breached the terms of the Employment Agreement. If so, Plaintiff will have sufficiently demonstrated Good Reason and a Qualifying Termination under the Severance Plan. (*See* Doc. 23-1 at 83 (providing that Good Reason means, among other conditions or events, "a material breach by the Company of any term of the Participant's employment agreement with the Company or of the Participant's other agreements with the Company")). The Court will address Plaintiff's two breach arguments in turn.

### a. Timing and Manner of Payout

Plaintiff's first argument is that the timing and manner of payout of the 2020 Bonus "breached Section 2(b) of the Employment Agreement, which requires [Plaintiff]'s bonuses to be paid fully in cash." (Doc. 29 at 19). Rather than offering its own responsive argument, Defendant's Response brief merely repeats the Claim Reviewer's reasoning:

> First, [Plaintiff] complains that the timing of the 2020 bonus payment constituted a breach of the Employment Agreement. The Claim Reviewer determined that the timing of [Plaintiff]'s 2020 bonus did not constitute Good Reason because (a) he agreed to the timing of that payment, and, importantly, (b) he did not challenge the timing of that payment as Good Reason within the 90-day period set forth in the Plan.

(Doc. 37 at 14 (citing Doc. 25-7 at 12)). In relying on this reasoning, Defendant misconstrues Plaintiff's argument to this Court *and* the Claim Reviewer's reasoning. In finding that Plaintiff failed to challenge the timing of the 2020 Bonus payment within the 90-day period, the Claim Reviewer was referencing a *different* breach argument that Plaintiff does not reassert to this Court. Plaintiff had argued that § 2(b) required payment of the 2020 Bonus on or before December 31, 2020, and that the January 21, 2021 issuance of the 2020 Bonus therefore breached § 2(b). (*See* Doc. 22-8 at 15). The Claim Reviewer referenced § 4.4(b) of the Severance Plan, which requires the participant to "give[] the Company written notice, within ninety (90) days following the first occurrence of the condition(s) that the Participant believes constitute(s) 'Good Reason.'" (Doc. 22-10 at 56 (quoting Doc. 23-1 at 83)). The Claim Reviewer concluded, *correctly*, that Plaintiff had until March 31, 2021 to provide notice that Good Reason existed as a result of Defendant's failure to pay the 2020 Bonus on or before December 31, 2020. (*Id.*).

However, Plaintiff's argument before this Court is based on his *other* allegation of breach based on the timing and manner of payment. Plaintiff argues that the Written Consent's provision requiring payment to be made in monthly installments, as opposed to a lump sum cash payment, constituted an independent breach of § 2(b). (Doc. 29 at 19). Plaintiff's April 5, 2021 Notice of Good Reason provided notice of this breach *within* the 90-day window, which lasted from January 21, 2021 (when the monthly payment structure was put in place) until April 21, 2021. (*See* Doc. 22-8 at 15). The Claim Reviewer—and Mr. Welo, to the extent Defendant's May 25, 2021 Response to Plaintiff's Claim Initiation (which incorporated the reasoning from Mr. Welo's May 4, 2021 Response to Notice of Good Reason) may be considered the initial denial of Plaintiff's claim—entirely failed to address this argument.

Despite Defendant and the Claim Reviewer's failure to adequately respond to Plaintiff's timing-and-manner-of-payment argument, the Court nonetheless finds—upon this *de novo* review—that the monthly installment structure did *not* breach the Employment Agreement. "When applying a *de novo* standard of review, courts first look to the 'explicit

language of the agreement to determine, if possible, the clear intent of the parties' when disputes regarding the interpretation of an ERISA plan arise." *Hoffman v. Am. Soc. for Technion-Israel Inst. of Tech., Inc.*, No. 09-CV-2482 BEN (KSC), 2013 WL 286267, at *2 (S.D. Cal. Jan. 24, 2013) (quoting *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997)). "Terms in an ERISA plan should be interpreted in an ordinary and proper sense as would a person of average intelligence and experience." *Id.* (quotation marks omitted) (quoting *Richardson*, 112 F.3d at 985).

Here, the language of § 2(b) of the Employment Agreement offers one possible basis for Plaintiff's contention that monthly installment payments were not permitted. Specifically, § 2(b) incorporates the Bonus Plan by providing that "[t]he actual amount of any Bonus, and your entitlement to the Bonus, will be subject to the terms of the Bonus Plan." (Doc. 22-2 at 31). Section 6(b) ("Form and Timing of Payment") of the Bonus Plan, in turn, provides language that—at first glance—appears to prohibit bonus payments by monthly installment:

> [A]s soon as practicable following the Committee's determination of the Bonuses payable for the applicable Performance Period, each Participant will receive a cash lump sum payment of his or her or its Bonus, less required withholding. In no event will such payment be made later than March 15 of the year following the year that contains the end of the Performance Period.

(Doc. 24-2 at 44). Under these terms, it would appear that the payment structure set forth in the Written Consent was not permitted. Not only did the Written Consent provide that the 2020 Bonus be paid in "equal weekly installments"—as opposed to a cash lump sum payment—it also spread those installments "over a 52-week period" which necessarily meant that much of the 2020 Bonus would be paid *after* March 15, 2021. (Doc. 22-8 at 6). However, the Court finds that § 6(b) of the Bonus Plan was *not* incorporated into § 2(b) of the Employment Agreement. Rather, the plain language of § 2(b) provides that only two considerations were "subject to the terms of the Bonus Plan": (i) the actual *amount* of any Bonus, and (ii) the participant's *entitlement* to the Bonus. (Doc. 22-2 at 31). Section 2(b)

does *not* provide that the *form and timing of payments* are subject to the terms of the Bonus Plan. Thus, § 2(b)'s incorporation of the Bonus Plan does *not* support a finding that the monthly installment payment structure amounted to a breach.

Review of the Employment Agreement does not reveal any other provision supporting Plaintiff's contention that monthly installment payments were prohibited. Rather, the Employment Agreement simply provides that the employee is "eligible to receive an annual cash bonus [] payable at the end of each calendar year of employment *or at such other time as agreed to between you and the Company*." (Doc. 22-2 at 31 (emphasis added)). Accordingly, the Written Consent served as the requisite agreement between the Compensation Committee and Plaintiff that the 2020 Bonus be paid in monthly installments over 52 weeks rather than as a lump sum paid at the end of the calendar year or otherwise prior to March 15, 2021.

Although Plaintiff does not make the argument in his briefing to this Court, Plaintiff argued in his October 13, 2021 Supplement to Appeal that he never agreed to the Written Consent in the first place. (Doc. 24-2 at 26). Indeed, Plaintiff did not sign the Written Consent, as it was signed only by William Staunton and Robert Dingess. (Doc. 22-8 at 10). In rejecting this argument, the Claim Reviewer found that Plaintiff conceded that he was nonetheless involved in preparing the Written Consent and that this sufficed to show his agreement to its terms. (*See* Doc. 22-10 at 56). Plaintiff has never disputed his involvement in preparing the Written Consent. Rather, Plaintiff argued in his appeal that he was merely carrying out his duty, as General Counsel, to "prepar[e] board resolutions and minutes for the Board and its committees" and that, had he refused to prepare the Written Consent, he would have "risk[ed] being disciplined for insubordination and breach of his Employment Agreement." (Doc. 24-2 at 26). In denying Plaintiff's appeal, the Claim Reviewer found Plaintiff's argument uncredible, pointing out that Plaintiff "could have, but do[es] not claim to have, asked questions about or challenged [his] bonus award when [he] found out what it was going to be" and that he "provided no evidence to support [his] contention that expressing    disagreement    with    [his]    bonus    award    would    have    amounted    to

'insubordination.'" (Doc. 25-7 at 12). The Court agrees with the Claim Reviewer's reasoning and is also unpersuaded by Plaintiff's argument that he did not agree to the Written Consent. Plaintiff does not reassert the argument in his Opening Brief, and therefore fails to point the Court to any evidence in the record supporting this position. Moreover, the Court finds that the facts that Plaintiff prepared the Written Consent without objecting in any way *and accepted the first two monthly installment payments* (again, without objecting or otherwise taking issue) demonstrates that he agreed to the Written Consent's monthly payment structure. In sum, the timing and manner of payment for Plaintiff's 2020 Bonus did *not* amount to a material breach of the Employment Agreement.

### b. Cease of Bonus Payments

The Court now turns to Plaintiff's *second* breach argument—that Defendant's decision to cease all payments of his 2020 Bonus constituted a breach of the Employment Agreement and gave Plaintiff the necessary Good Reason to make his resignation a Qualifying Termination. (Doc. 29 at 19–20). Again, Defendant's Response brief does not offer any meaningful responsive argument and instead merely quotes from a portion of the Claim Reviewer's reasoning. (*See* Doc. 37 at 14). The Court has fully considered the Claim Reviewer's reasoning but does not give it any deference in this *de novo* review.

As noted above, § 2(b) of the Employment Agreement incorporates the Bonus Plan to the extent it guides the determination of the *amount* of any bonus and an employee's *entitlement* to a bonus. (Doc. 22-2 at 31 ("The actual amount of any Bonus, and your entitlement to the Bonus, will be subject to the terms of the Bonus Plan)). The Bonus Plan, in turn, provides that the payment of any bonus is "contingent on the attainment of Performance Goals" during the relevant year. (Doc. 24-2 at 39). Performance Goals are selected by the Compensation Committee and are "based upon one or more Performance Criteria." (*Id.* at 40). Section 2(j) of the Bonus Plan provides numerous examples of Performance Criteria that may be used by the Compensation Committee. (*Id.*).

Here, the Compensation Committee approved the 2020 Bonus after apparently finding that certain revenue targets, *i.e.* Performance Goals, for 2020 had been achieved.

(Doc. 22-10 at 57). Just a few weeks after issuing the 2020 Bonus, however, Defendant apparently learned that it was likely going to have to restate its 2020 financials "by significantly reducing revenue, gross margins and profit." (*Id.*). Given that the approval of the 2020 Bonus was based on these financial figures, the Claim Reviewer found that the Compensation Committee's decision to suspend[7] bonus payments was justified:

> Since (i) pursuant to the Bonus Plan, your Bonus is based primarily on such objective financial Performance Criteria[;] (ii) the Plan gives the Compensation Committee discretion to determine the applicable Performance Criteria; and (iii) the Board and the Compensation Committee have discretion under the Plan to clawback or recoup any bonuses paid under the Plan, it is my determination that the Company's suspension of your 2020 cash bonus in anticipation of its restatement was consistent with the Company's obligation to you pursuant to the terms of your Employment Agreement and the Bonus Plan, and also consistent with the Company's obligation to its shareholders. Indeed, it would have been entirely inappropriate for the Company to continue to pay bonuses based on inaccurate metrics.

(*Id.*). Plaintiff argues that the Claim Reviewer—and Mr. Welo, to the extent Defendant's May 25, 2021 Response to Plaintiff's Claim Initiation (which incorporated the reasoning from Mr. Welo's May 4, 2021 Response to Notice of Good Reason) may be considered the initial denial of Plaintiff's claim—"failed to identify any contract or Plan provision allowing Taronis to void [Plaintiff]'s bonus on that basis, did not claim that restated financial numbers were available and disqualified [Plaintiff] from a bonus under the criteria the Compensation Committee used when granting the bonus, and failed to cite any action taken by the Board or the Compensation Committee to rescind or alter the bonus award." (Doc. 29 at 19). Thus, Plaintiff argues that Defendant's decision to cease the 2020 Bonus

---

[7] The Claim Reviewer refers to Defendant's decision to stop all bonus payments as a "suspension" of the payments. Suspension, of course, implies that the cease of payments may be temporary and that the payments may resume at some point. However, nothing in the record indicates that Defendant's decision to cease the payments was intended to be temporary and the Claim Reviewer does not meaningfully explain or support its use of the term "suspension." Thus, the Court will not refer to the cease of bonus payments as a "suspension" of payments.

payments breached the Employment Agreement, regardless of the fact that restatement of the 2020 financials may have been necessary. (Id. at 19–20).

The Court agrees with Plaintiff, at least with respect to the issues he raises with the Claim Reviewer's reasoning. The Claim Reviewer identified only *one* provision permitting Defendant to cease the payment of benefits: the Bonus Plan's "Clawback Provision." (Doc. 22-10 at 57). Section 8(l) of the Bonus Plan ("Clawback") provides:

> All Bonuses are subject to clawback or recoupment *under any clawback or recoupment policy adopted by the Board or the Committee* in effect from time to time, *or required by Applicable Law*, during the term of Participant's employment or other service with the Company that is applicable to officers, employees, directors, or other service providers of the Company.
>
> No recovery of compensation under such a clawback or recoupment policy will be an event giving rise to a right to voluntarily terminate employment upon a "resignation for good reason," or for a "constructive termination" or any similar term under any plan or agreement with the Company.

(Doc. 24-2 at 45 (emphasis added)). The Court finds the Clawback Provision inapplicable in this case. First, the action taken by Defendant was decidedly *not* a "clawback" or "recoupment" of bonus funds already paid to Plaintiff. Rather, Defendant stopped making bonus payments altogether. Second, even setting aside this fundamental issue, the Court is not aware of—and Defendant and the Claim Reviewer failed to identify—*any* evidence in the record demonstrating that the Board or the Compensation Committee adopted a "clawback or recoupment policy" at any time, as required by § 8(l). Likewise, there is no evidence demonstrating that there was any "Applicable Law" providing for a clawback or recoupment policy that was in effect "during the term of [Plaintiff]'s employment," as alternatively required by § 8(l). Thus, § 8(l) is entirely irrelevant to the present case and the Claim Reviewer's reference to the provision is meaningless. Aside from the Clawback Provision, the Claim Reviewer (and Defendant, in its briefing to this Court) failed to identify any provision—in the Employment Agreement, Bonus Plan, Written Consent, or any other relevant agreement between the parties—permitting Defendant to the cease the

payment of an already-approved and partially-issued bonus.

This Court's own review of the Bonus Plan reveals a few provisions worth considering. First, § 8(f) ("Amendment or Termination of the Plan") provides as follows:

> The Board or the Committee may, at any time, amend, suspend, or terminate the Plan in whole or in part. Notwithstanding the foregoing, *no amendment will adversely affect the rights of any Participant to Bonuses allocated prior to such amendment, suspension, or termination*.

(Doc. 24-2 at 45). At first glance, this provision would seem applicable, as Defendant had already begun allocating the 2020 Bonus when it decided to terminate the bonus payments entirely. In this way, § 8(f) would *prevent* Defendant's decision to terminate payments from affecting any right Plaintiff had to the 2020 Bonus.[8] However, the Court finds that § 8(f) does *not* apply to this case because the provision, by its express terms, only contemplates a Board or Committee decision that "amend[s], suspend[s], or terminate[s]" *the Bonus Plan*. Here, the Compensation Committee did not "terminate" any aspect of the Bonus *Plan*; rather, it terminated the bonus *payments* for a specific bonus award that had been allocated pursuant to the Bonus Plan.

Second, § 8(c) ("No Right to Bonus") provides as follows:

> Unless otherwise expressly set forth in an employment or other agreement between the Company . . . and a Participant, a Participant will not have any right to any Bonus under the Plan until such Bonus has been paid to such Participant. Participation in the Plan in one Performance Period does not connote any right to remain a Participant in the Plan in any future Performance Period.

(Doc. 24-2 at 44). Given that the 2020 Bonus was not fully paid to Plaintiff at the time

---

[8] The Court recognizes that this application of § 8(f) also relies on a rather broad reading of the term "allocate." The 2020 Bonus was only *partially* allocated to Plaintiff at the time Defendant terminated the bonus payments. If the second sentence of § 8(f) is read to only protect the rights of participants whose bonuses were *fully* allocated at the time of the Board or Committee's action, then the provision necessarily allowed Defendant to terminate the payments in this case *regardless* of how it affected Plaintiff's right to the 2020 Bonus, which was only partially allocated.

Defendant terminated the payments, § 8(c) could be read to provide that Plaintiff did not have any enforceable right to the 2020 Bonus, and that the provision thereby precluded him from arguing that Defendant's termination of payments violated the Employment Agreement in any way. However, § 8(c) is susceptible to an alternative reading if the word "paid" is defined more broadly. In this case, Defendant had already made two payments under the 2020 Bonus at the time it terminated the payments. Plaintiff would therefore seem to have a "right" to at least some portion of the 2020 Bonus. Moreover, Plaintiff could argue that he had a right to *all* of the 2020 Bonus given § 8(c)'s failure to specify that the bonus be *fully* paid. Likewise, the final sentence of § 8(c) would seem to imply that the purpose of the provision is to prevent a participant from arguing that he is entitled to a bonus in advance of that bonus actually being allocated to him, rather than creating a circumstance where he has a right to one portion of a bonus but not to another. In sum, the Court finds that § 8(c) is ambiguous. Such an ambiguity must be construed against Defendant. *See Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 942 (9th Cir. 1995) (noting that ambiguous terms in an ERISA plan must be construed against the drafter).

The Bonus Plan provision *most* supportive of Defendant's decision to terminate the bonus payments is § 6(a) ("Determination of Bonuses"):

> In general, the Committee will determine the extent to which the Performance Goals have been achieved or exceeded, and the amount of each Participant's Bonus, if any, following the completion of each Performance Period. *The Committee may reduce, eliminate, or increase the amount of a Bonus if, in its sole discretion, such adjustment is deemed appropriate*.

(Doc. 24-2 at 44 (emphasis added)). This provision expressly permitted Defendant to *eliminate* the amount of the 2020 Bonus if it deemed such action "appropriate." Moreover, § 6(a) is unconditional. It gave the Compensation Committee *sole discretion* to eliminate the 2020 Bonus so long as the Compensation committee found such action to be appropriate. Here, Defendant found that uncertainties surrounding the financial state of the company—namely, the likelihood that the Company's 2020 financial figures would need

to be restated—justified a termination of the bonus payments. The Court finds that § 6(a) permitted such action. Plaintiff argues that Defendant was aware of such financial concerns at the time it awarded the 2020 Bonus, but nonetheless failed to condition the payment of the 2020 Bonus on those concerns coming to fruition. Plaintiff also argues that Defendant never restated its 2020 financials. Thus, Plaintiff contends that Defendant's reasoning was merely pretextual. Regardless of these arguments from Plaintiff, however, the Court finds that § 6(a)'s grant of *sole discretion* to the Compensation Committee obviates any need for this Court to consider the merits of Defendant's reasoning.

The fact that § 6(a) provided a contractual basis for Defendant's action says nothing about the manner in which Defendant went about terminating the bonus payments. The 2020 Bonus was issued via the Written Consent, which expressly provides that it has "the same force and effect as if such resolutions had been duly adopted and such actions duly taken at a meeting of the Board duly called and convened for such purpose . . . with a full quorum present and acting throughout." (Doc. 22-8 at 6). Under Defendant's bylaws, such an action was a valid and enforceable act of the Compensation Committee. (*See* Doc. 24-4 at 3 (providing procedure for Board or Committee to take action without a meeting); Doc. 22-8 at 9 ("[T]his [Written Consent] shall be filed with the minutes of meetings of the Committee and shall be treated for all purposes as an action taken at a meeting.")). Plaintiff argues that Defendant's decision to *cease* bonus payments, however, did not conform to the bylaws in the same manner. Indeed, the record is entirely devoid of any evidence related to *how* Defendant went about ceasing the bonus payments. There is no evidence that a Board meeting occurred, nor is there any evidence that the Board or Compensation Committee terminated the bonus payments via a permissible "Action Without Meeting," pursuant to § 24 of the bylaws. (*See* Doc. 24-4 at 3). In fact, the Court has no way of knowing whether it was the Board or the Compensation Committee that actually made the decision. The Court would not even be able to confirm that bonus payments actually ceased in February 2021 if it were not for the parties' agreement on that fact. Given this absence of relevant evidence in the record, the Court also has little insight into the reasoning behind

the decision and is unable to confirm that bonus payments were ceased for the reasons stated by the Claim Reviewer.

In light of this complete lack of evidence, the Court can only conclude that either the Board or the Compensation Committee *may* have taken an action—terminating bonus payments and "undoing" the Compensation Committee's valid and enforceable act (*i.e.*, the Written Consent)—without complying with the procedures set forth in Defendant's bylaws. If true, and as Plaintiff noted in his appeal, this would reasonably imply that Defendant's action "was invalid under its primary governing document." (Doc. 24-2 at 29). The validity of a corporate action taken by Defendant, however, is not the issue that is before the Court. Rather, the Court is charged with determining whether Defendant's action amounted to a breach *of the Employment Agreement*. Plaintiff does not allege that Defendant violated the Employment Agreement by failing to comply with its own bylaws. Rather, Plaintiff takes issue with Defendant's termination of payments, *regardless* of the procedures taken to carry out that termination. Indeed, Plaintiff fails to identify—and this Court does not itself find—any provision of the Employment Agreement that was violated by Defendant's supposed procedural violation of its own bylaws.

Even assuming that Defendant's conduct amounted to a procedural violation of Taronis' bylaws, the Court finds that such a violation was not material. The Bonus Plan provided the Compensation Committee with *sole discretion* to terminate the 2020 Bonus payments. Therefore, the specific action at issue here was expressly permitted. Whether or not Defendant complied with the correct procedures in taking such action did not have a material effect on Plaintiff. This is demonstrated by the fact that, had the Board or Compensation Committee *sufficiently* complied with bylaw procedures by, for example, issuing a second Written Consent terminating the 2020 Bonus payments, Defendant would have no way of arguing that the termination violated the Employment Agreement because the termination would have been permitted by the Bonus Plan and it would have been carried out as a valid and enforceable action of the Board or Compensation Committee.

In sum, the Court finds that Defendant did not breach the parties' Employment

Agreement by issuing Plaintiff's 2020 Bonus payments in monthly installments or by terminating those payments altogether. Therefore, Plaintiff has not demonstrated Good Reason sufficient to support a Qualifying Termination under the Severance Plan.

**C. Change in Control Issue**

Given the Court's finding that Plaintiff failed to demonstrate Good Reason sufficient to trigger a Qualifying Termination under the Severance Plan, the Court need not address the parties' dispute with respect to whether Plaintiff resigned during a Change in Control period.

**IV.    CONCLUSION**

The Court finds that Plaintiff failed to demonstrate Good Reason under the Severance Plan. Thus, his resignation did not amount to a Qualifying Termination, and he is not entitled to severance benefits.

Accordingly,

**IT IS ORDERED** that Plaintiff's claim for benefits under 29 U.S.C. § 1132(a)(1)(B) (§ 503(a)(1) of ERISA) is **denied**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall **enter judgment** and **terminate** this action accordingly.

Dated this 5th day of July, 2023.

Honorable Steven P. Logan
United States District Judge